**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM W. SMITH and ANGELA M. SMITH, | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL CASE NO. 3:09-268 |
| v. | ) ) | JUDGE KIM R. GIBSON |
| STECKMAN RIDGE, LP, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.     Introduction

This matter comes before the Court on allegations of a *de facto* taking of property under Pennsylvania eminent domain law.  Plaintiffs William and Angela Smith argue that Defendant Steckman Ridge, LP, effectuated a *de facto* taking by storing natural gas under their property.  Steckman Ridge argues that an existing oil and gas lease permits these storage activities, and thus no taking has occurred.  Steckman Ridge has filed a motion for summary judgment (ECF No. 81), asking the Court to find that the lease is valid as a matter of law.  For the reasons that follow, the motion will be granted.

### II.     Jurisdiction and Venue

The Court exercises diversity jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, and the suit is between citizens of different states. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to the claims occurred in this judicial district.

### III. Background

Following more than three years of discovery, only one issue remains in this case: whether Steckman Ridge has the continued right to store natural gas under the Smiths' property based on the terms of an oil and gas lease.[1]  For purposes of this decision, only the undisputed facts will be cited and considered by the Court.

#### A. Terms of the lease

On May 18, 2000, the Smiths and Pennsylvania General Energy Corporation (PGE) executed an oil and gas lease concerning the Smiths' approximately 105 acres of property in Bedford County, Pennsylvania.  (ECF No. 83 ¶ 1; ECF No. 85 at 3).  A copy of the lease is attached as Exhibit 1 in the appendix to Steckman Ridge's concise statement of material facts (ECF No. 84-1).

##### 1. Duration and purpose of lease

The lease in this case is known in the oil and gas industry as a dual purpose lease because it contemplates both hydrocarbon production and storage activities.[2]  Specifically, the lease gives Steckman Ridge the right to produce and store gas on the Smiths' property:

---

[1] In the initial complaint, the Smiths averred that an additional *de facto* taking occurred on August 23, 2009, "via an explosive release of materials from the Steckman Ridge compressor station onto the Smith party."  (ECF No. 1-1 ¶ 15).  The Smiths moved to withdraw this claim during oral argument on September 12, 2013, acknowledging that it was not factually supported.  (ECF No. 92 at 21:21–22:1).  The parties subsequently filed a stipulation to that effect, agreeing that this claim is no longer at issue.  (ECF No. 95).

[2] *See Jacobs v. CNG Transmission Corp.*, 332 F. Supp. 2d 759, 765 (W.D. Pa. 2004) (discussing a dual purpose lease).

> Lessor [the Smiths] hereby grants, leases and lets exclusively to Lessee [Steckman Ridge] all the oil and gas and their constituents, whether hydrocarbon or nonhydrocarbon, . . . together with such exclusive rights as may be necessary or convenient for Lessee . . . to explore for, develop, produce, measure, and market production from the Leasehold . . . [and] to store gas of any kind underground, regardless of the source thereof . . .

(Lease ¶ 1).  The lease includes a 5-year primary term and a possible extended term:

> This Lease shall remain in force for a primary term of <u>Five</u> years from <u>May 18, 2000,</u> (the "effective date") and for as long thereafter as prescribed payments are made**,** . . . or for as long as a well capable of production is located on the Leasehold, or for as long as extended by any provision herein, or for as long as the Leasehold is used for the underground storage of gas . . .

(*Id.* ¶ 3).

## 2.    Compensation for production activities

With respect to compensation, Steckman Ridge must pay a delay rental of $5 per net mineral acre per year, payable annually in advance, until drilling commences *and* once the property is converted for storage.  (Lease ¶ 4(A)).  Additionally, Steckman Ridge must pay royalties in an amount equal to one-eighth the total revenue realized on production. (*Id.* ¶ 4(B)).  Finally, to maintain the lease in the event that production is interrupted by a shut-in, and no other provision is extending the lease, Steckman Ridge must pay the Smiths the prescribed one-half delay rental as stated in the shut-in provision:

In the event that production of oil, gas, or their constituents is interrupted and not marketed for a period of six months, and there is no producing well on the Leasehold . . ., and the lease is not otherwise being held in force by any of the provisions herein, Lessee shall pay a shut-in payment equal in amount to one half (1/2) the annual delay rental until such time as production is re-established and said payment shall maintain this lease in full force and effect to the same extent as payment of royalty. The shut-in payment shall be due within 45 days of the end of any 6 month period during which there has not been any production from the Leasehold . . .

(*Id.* ¶ 4(D)).

### 3.    Compensation for storage activities

To store natural gas under the Smiths' property, Steckman Ridge must comply with the conversion-of-storage clause.  Specifically, Steckman Ridge must pay the Smiths for the estimated economically recoverable gas reserves under the Smiths' property, and it must pay the delay rental as discussed in paragraph 4(A):

Lessee is hereby granted the right to convert the Leasehold to gas storage. At the time of conversion, Lessee shall pay Lessor's proportionate part for the estimated recoverable gas remaining in the well using methods of calculating gas reserves as are generally accepted by the natural gas industry, and Lessor shall be paid Delay Rental for as long thereafter as the Leasehold is used for gas storage or for protection of gas storage.

(Lease ¶ 7).

### 4.    Cessation of production

At the center of this dispute is the "cessation-of-production" clause in the lease. This clause can extend the lease when the land is not producing gas in paying quantities, provided that Steckman Ridge maintains drilling or reworking operations on the Smiths' property.  The pertinent language provides:

If, after the expiration of the primary term of this lease, production of oil, gas or condensate on the Leasehold, . . . should cease, this lease shall not terminate, provided that Lessee commences operations for drilling, reworking, plugging back or deepening a well within ninety (90) days from such cessation, and this lease shall remain in force . . . for so long as such operations are prosecuted with no cessation of more than ninety (90) days, and, if production of oil, gas or condensate results from such operations, then this lease shall remain in force and effect for so long as production continues . . . or the term of this lease is otherwise extended by any of the provisions herein.

(Lease ¶ 12).

With these provisions in mind, the Court turns to the key events surrounding the dispute in this case.

### B.      Production and storage under the Smiths' property

Beginning in 2000, PGE paid the annual delay rentals as required under the lease. (ECF No. 83 ¶ 12; ECF No. 84-4).   These payments maintained the lease until production began in 2004.   From April 22, 2004, through December 6, 2006, PGE operated a well on the Smiths' property known as Well 1663.   (ECF No. 85 at 4; ECF No. 84-2 ¶ 14).   Between June 9, 2004, and February 27, 2007, PGE paid the Smiths monthly royalties based on the revenue realized on production.   (ECF No. 84-5).   The Smiths earned $872,031.52 in total production royalties.   (ECF No. 84-2; ECF No. 84-5 at 2).

The dispute in this case centers on events occurring in late 2006 and early 2007, when PGE shut in Well 1663.   The parties agree that a shut-in occurred on December 6, 2006.   (ECF No. 85 at 4).   At that time, Well 1663 was capable of producing gas in paying

quantities. (ECF No. 84-2 ¶ 17; ECF No. 84-8).[3] But the Smiths assert that production ceased on December 6, 2006—once the well was shut-in—and that production was never reestablished. (ECF No. 85 at 4). Based on the cessation-of-production clause, the Smiths argue that the lease expired on March 5, 2007—90 days after cessation. (Id.).

PGE assigned the lease to Steckman Ridge in March 2007. (ECF No. 84-2 ¶ 18; ECF No. 84-9 at 2). On July 3, 2007, Steckman Ridge offered the Smiths $387,202.65 for the estimated economically recoverable gas reserves, plus $520 for the annual delay rental. (ECF No. 84-3 at 3). According to Steckman Ridge, this payment was made in accordance with the conversion-of-storage provision in the lease and is what currently permits gas storage under the Smiths' property. Steckman Ridge further argues that the lease remains in full force because the cessation-of-production clause did not apply. Instead, Steckman Ridge claims that the shut-in afforded Steckman Ridge six months and forty-five days— on or before July 20, 2007—to extend the lease, as provided in the shut-in clause.

Although Steckman Ridge presented the Smiths with a payment for the gas reserves and the delay rental on July 3, 2007, the Smiths did not accept this payment. (ECF No. 84-2 ¶ 24). On July 3, 2008, Steckman Ridge presented the Smiths with a similar offer. (Id. ¶ 23). The Smiths did not accept this payment either. (Id. ¶ 24). On March 4, 2009, Steckman Ridge offered the Smiths $387,000.78 for the estimated recoverable gas

---

[3] A comprehensive expert report discusses the economic valuation of gas reserves contained in Well 1663. Specifically, as of December 1, 2006, Well 1663 contained approximately 2,795,727 Mcf of gross gas reserves and 331,764 Mcf of net gas reserves. (ECF No. 84-8 at 21, 25). Mcf equals the volume of 1,000 cubic feet (cf) of natural gas. *See* U.S. Energy Info. Admin., *Frequently Asked Questions*, http://www.eia.gov/tools/faqs/faq.cfm?id=45&t=8 (last updated Mar. 20, 2013).

reserves. The Smiths accepted this payment. (*Id.* ¶ 26). To date, the Smiths have not accepted any delay rental payments for storage, though they have been offered these payments since 2007. (*Id.* ¶ 29).

### C. Procedural history

On September 3, 2009, the Smiths filed a petition requesting the appointment of viewers in the Court of Common Pleas of Bedford County, Pennsylvania. The petition alleges that the lease expired on March 6, 2007, and that the gas storage under the Smiths' property effectuated a *de facto* taking. (ECF No. 1-1). On October 9, 2009, Steckman Ridge removed the case to this Court. In 2010—and before fact discovery had been conducted— the parties each filed motions for partial summary judgment regarding the validity of the lease. The Court denied both motions. (ECF No. 35). The parties have since conducted extensive discovery. In July 2013, Steckman Ridge filed the instant motion for summary judgment, and the parties presented oral argument on the motion in September 2013. (ECF No. 92, Summ. J. Tr. Sept. 12, 2013).

### IV. Standard of Review

Summary judgment should be granted only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts are those affecting the outcome of trial. *Id.* at 248. The

court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quotation omitted).

The moving party must initially demonstrate the absence of any genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must go beyond the pleadings, using affidavits, depositions, admissions, or answers to interrogatories that show there are genuine issues of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations in the pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## V.     Discussion

There are no disputes of material fact in this case. As noted above, the issue is strictly one of contract interpretation—a question of law. Specifically, the Court must determine whether Steckman Ridge has the continued right to store natural gas under the Smiths' property based on the terms of the lease. Two clauses are particularly relevant: the cessation-of-production clause (Lease ¶ 12) and the shut-in clause (*Id.* ¶ 4(D)). Because this case arises under the Court's diversity jurisdiction, Pennsylvania substantive

law is applied.  *Lafferty v. St. Riel*, 495 F.3d 72, 76 (3d Cir. 2007) (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938)).

### A.      Contract principles under Pennsylvania law

Pennsylvania oil and gas leases are governed by general principles of contract interpretation.  *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012).  A lease must be construed using the terms of the agreement "as manifestly expressed."  *Willison v. Consolidation Coal Co.*, 637 A.2d 979, 982 (Pa. 1994).  Thus, "[t]he accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement."  *Id.* (quotation omitted); *accord T.W. Phillips*, 42 A.3d at 261.  The party seeking to invalidate the lease bears the burden of proof.  *T.W. Phillips*, 42 A.3d at 261 (citation omitted).

Where an ambiguity exists in a contract—as the Smiths argue here—a court may resort to extrinsic or collateral circumstances to determine the meaning of the disputed provisions.  *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986) (citations omitted).  But a contract is only ambiguous when it is "reasonably susceptible of different constructions and capable of being understood in more than one sense."  *Id.*  The court determines whether an ambiguity exists as a matter of law.  *Id.*

### B.      Key provisions in standard oil and gas leases

To better assess the parties' arguments, the Court begins with an overview of key provisions found in most oil and gas leases.  As this Court recognized in *Jacobs v. CNG*

*Transmission Corp.*, 332 F. Supp. 2d 759, 764 (W.D. Pa. 2004), many "basic contractual principles" in oil and gas leases were established between the 1880s and 1940s. Indeed, Pennsylvania has a rich history in the petroleum industry, beginning in 1859 with the drilling of the world's first commercial oil well in Crawford County.[4] "Since that time, countless landowners have contracted with oil and gas companies to reap the financial benefits of the resources hidden deep beneath their property." *Hite v. Falcon Partners*, 13 A.3d 942, 946 (Pa. Super. Ct. 2011).

Today, most oil and gas leases contain standard provisions that are "universally recognized within the field." *Jacobs*, 332 F. Supp. 2d at 764 (W.D. Pa. 2004). For example, oil and gas leases include a granting clause and a habendum clause. *Id.* The granting clause specifies the interest conveyed, such as the right to produce oil from the property. *See* Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law* § 665 (LexisNexis Matthew Bender 2013). In this case, the granting clause conveys rights incident to hydrocarbon production and storage, making it a dual purpose lease. (Lease ¶ 1). The habendum clause defines how long the interest is granted, often for a primary (definite) term of years and a secondary (indefinite) period. *Williams & Meyers* § 603. Here, the lease has a 5-year primary term and a possible secondary term. (Lease ¶ 3).

---

[4] *See* Patrick C. Mcginley, *Regulatory Takings in the Shale Gas Patch*, 19 Penn St. Envtl. L. Rev. 193, 240 (2011) (discussing the history of the oil and gas industry in Pennsylvania).

In addition to the standard provisions noted above, modern oil and gas leases usually include savings clauses that can extend the lease. According to the *Manual of Oil and Gas Terms* ("*Manual*"),[5] a savings clause is described as follows:

> **Savings clause**
> A lease clause designed to enable a lessee to keep a lease alive under certain circumstances without the production otherwise required. Common savings clauses are the CONTINUOUS DRILLING OPERATIONS CLAUSE (*q.v.*); DRILLING OPERATIONS CLAUSE (*q.v.*); FORCE MAJEURE CLAUSE (*q.v.*); and SHUT-IN GAS WELL CLAUSE (*q.v.*).

Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law, Oil and Gas Law Scope* (LexisNexis Matthew Bender 2013). The lease in this case includes a shut-in clause at paragraph 4(D). The *Manual* defines a shut-in clause as follows:

> **Shut-in gas well clause**
> A lease clause which authorizes a lessee to pay a shut-in gas well royalty and thereby keep a lease alive without actual production when and if a well has been drilled which is capable of producing gas in paying quantities but which is shut-in . . .

*Id.*

A cessation-of-production clause is another provision found in most oil and gas leases. The *Manual* defines this clause as follows:

> **Cessation of production clause**
> A lease clause providing that under certain circumstances a lease may be preserved despite cessation of production in the primary or secondary term. Usually the lessee must resume the payment of rentals (if within the primary term) or commence reworking, redrilling or new drilling

---

[5] *William and Meyers, Oil and Gas Law,* along with its *Manual of Oil and Gas Terms*, is arguably the foremost authoritative treatise on the law relating to oil and gas. It is frequently cited by Pennsylvania courts. *See, e.g., T.W. Phillips Gas & Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (2012); *Hite v. Falcon Partners*, 13 A.3d 942, 947 (Pa. Super. Ct. 2011).

operations upon the premises within a designated period of time after the cessation of production in order to keep the lease alive.

*Id.* In this case, the lease includes a cessation-of-production clause at paragraph 12.

With these general principles in mind, the Court now transitions to the parties' arguments concerning summary judgment.

### C.    The parties' arguments

Steckman Ridge moves for summary judgment on the grounds that the cessation-of-production clause is inapplicable to the shut-in of Well 1663.  Rather, Steckman Ridge argues that the shut-in was "constructive production" and that the shut-in clause afforded six months and forty-five days to extend the lease.  (ECF No. 82 at 11).  According to Steckman Ridge, the lease remains in full force because, within the time allotted by the shut-in clause, it offered to make substantial payments to convert Well 1663 to storage.

In opposing summary judgment, the Smiths argue that the lease is ambiguous. (ECF No. 85 at 7).  In their view, the shut-in constituted a cessation-of-production, affording Steckman Ridge just 90 days to resume production activities before the lease terminated.  According to the Smiths, the lease expired on March 5, 2007, because Steckman Ridge failed to resume production activities within 90 days of the shut-in on December 6, 2006.  (*Id.* at 6).  The Smiths further argue that the lease amounted to a "no term" lease and is thus unenforceable under Pennsylvania law.  (*Id.*).

**D.      The plain meaning of the lease**

As discussed previously, the Court must interpret the terms in the lease using general principles of contract interpretation.  The Court must consider the plain meaning of the writing itself, and the entire writing must be considered:  the "[w]hole instrument must be taken together in arriving at contractual intent."   *Murphy v. Duquesne Univ. of The Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001).

This case hinges on the plain meaning of the shut-in clause and the cessation-of-production clause.  The pertinent language provides:

> **(D) SHUT-IN**: In the event that production of oil, gas, or their constituents is interrupted and not marketed for a *period of six months*, and *there is no producing well on the Leasehold . . ., and the lease is not otherwise being held in force by any of the provisions herein*, Lessee shall *pay a shut-in payment equal in amount to one half (1/2) the annual delay rental* until such time as production is re-established and said payment shall maintain this lease in full force and effect to the same extent as payment of royalty. The shut-in payment *shall be due within 45 days of the end of any 6 month period* during which there has not been any production . . .

* * *

> **12. CESSATION OF PRODUCTION**.  . . . *If, after the expiration of the primary term of this lease, production of oil, gas or condensate on the Leasehold, or lands pooled or unitized herewith, should cease, this lease shall not terminate, provided that Lessee commences operations for drilling, reworking, plugging back or deepening a well within ninety (90) days from such cessation*, and this lease shall remain in force . . . for so long as such operations are prosecuted . . . , and, if production of oil, gas or condensate results from such operations, then this lease shall remain in force and effect for so long as production continues or operations are being conducted as herein provided, *or the term of this lease is otherwise extended by any of the provisions herein*.

(Lease ¶¶ 4(D) and 12) (emphasis added). Using the general principles of contract interpretation discussed above, the Court finds that paragraph 4(D) can extend the lease when a shut-in occurs and

(1) there is no producing well on the property for six months;
(2) no other provision is holding the lease in force; and
(3) within 45 days of the end of the six-month period, a payment is made in an amount equal to one-half the annual delay rental.

The Court also interprets the language of the cessation-of-production clause as authorizing an extension of the lease when

(1) the production of gas ceases after the primary term; and
(2) Steckman Ridge commences operations for drilling, reworking, plugging back or deepening the well within 90 days.

Based on the preceding language, the Court further finds that Steckman Ridge can extend the lease term by satisfying either of these clauses. Noticeably absent from the cessation-of-production clause is any language stating that its terms *must* be satisfied or else the lease *must* terminate. Rather, the cessation-of-production clause states that any other provision in the lease can extend the term: "this lease shall remain in force and effect for so long as production continues or . . . *the term of this lease is otherwise extended by any of the provisions herein*." (Lease ¶ 12) (emphasis added).

This interpretation is consistent with reliable authorities in oil and gas law. That is, leading secondary sources describe both the cessation-of-production clause and the shut-in clause as "saving clauses" that enable the lessee to keep the lease in full force without the production otherwise required under the lease. *See* Patrick H. Martin and Bruce M. Kramer, *Williams & Meyers, Oil and Gas Law, Oil and Gas Law Scope* (LexisNexis

Matthew Bender 2013); John S. Lowe et al., *Cases and Materials on Oil and Gas Law*, 249–50 (6th ed. West 2013).[6]

### E.     The contract is not ambiguous

Based on the foregoing analysis, the Court finds that no ambiguity exists when applying the undisputed facts to the provisions in the lease.  The Smiths assert that the lease is ambiguous and that the lease expired 90 days after the shut-in.  But the Smiths provide no support for their assertions, either through case law or through secondary sources.  Additionally, the Smiths do not cite any facts in the record that would otherwise show an ambiguity in the lease.  Because the shut-in clause can independently extend the lease, the Court need not consider the cessation-of-production clause any further.

### F.     The shut-in clause kept the lease in full force

It is undisputed that Well 1663 was shut-in on December 6, 2006, and that there was no producing well on the property for six months.  As well, the parties do not dispute that, during the six-month period after the shut-in, the lease was not held in force by any other provision.  Finally, within six months and forty-five days of the shut-in—on or about July 3, 2007—Steckman Ridge offered the Smiths $345,202.65 for both the estimated economically recoverable gas reserves in Well 1663 *and* the annual delay rental.

---

[6] Lowe et al. state the following: "Modern oil and gas leases include savings clauses that address the circumstances that commonly prevent a lessee from obtaining or maintaining 'production.' Among the most important lease clauses are the shut in royalty clause, the cessation of production clause, dry hole and operations clauses and the force-majeure clause. All of these savings clauses may be thought of as providing substitutes for production or constructive production, because they state that specified occurrences or actions will be considered to be production for purposes of the lease."

These facts present an interesting issue, though unaddressed by either party, in that Steckman Ridge has never paid the one-half annual delay rental as required under the shut-in clause. Rather, Steckman Ridge paid the entire amount owed to convert Well 1663 to storage, as provided in paragraph 7 of the lease. This storage payment was made *after* the expiration of the six-month shut-in period and *before* the end of 45-day period in which the shut-in royalty was due. According to *Williams & Meyers*:

> In most (but not all) states timely payment of the shut-in royalty is requisite to keep the lease alive after the expiration of the primary term for unless payment is timely there cannot be said to be production required by the "thereafter" clause of the lease. Similarly, if under the provisions of the delay rental clause, "production" or payment of rentals is required on or before an anniversary date, there must be timely payment of either the shut-in royalty or of the delay rental to prevent termination of the lease. . . .

*Williams & Meyers, Oil and Gas Law, Oil and Gas Law Scope* (LexisNexis Matthew Bender 2013); *accord Welsch v. Trivestco Energy Co.*, 221 P.3d 609, 614 (Kan. Ct. App. 2009).[7] The Court is thus presented with an issue of first impression in Pennsylvania: whether, to avoid termination of a lease, a party can offer an annual delay rental for gas storage in lieu of the shut-in royalty for delayed production.

After a thorough review of case law from Pennsylvania and other jurisdictions, the Court is unable to find any cases that directly address this issue. Based on the language in the lease, however, and after considering the principles of equity, the Court finds that the offer of payment for gas storage was sufficient to avoid forfeiture under the lease.

---

[7] The Kansas court stated: "Generally, reliable authorities recognize that an option to pay shut-in gas royalties—in contrast to an obligation to do so—can support cancellation where the optional royalties are not paid. Generally, such an option is considered to create a special limitation on the lease, and the failure to pay the shut-in royalties will terminate the lease." (citations omitted).

Specifically, the shut-in clause would have extended the lease term if Steckman Ridge had paid the one-half delay rental.  Because Steckman Ridge offered a timely payment of an annual delay rental (albeit for storage, not as a shut-in royalty), the lease was not forfeited and otherwise remains in force.[8]  While this offer of payment maintained the lease after the six month shut-in period, Steckman Ridge has never made the necessary payment under the shut-in clause.  Accordingly, the Smiths are still entitled to the unpaid one-half annual delay rental provided in the shut-in clause.

Critical to the Court's holding is the fact that Steckman Ridge offered to make a delay rental payment within the time allotted by the shut-in clause.  Specifically, Well 1663 was shut-in for six months and, within 45 days of the end of this period, Steckman Ridge offered to make a substantial payment.  Instead of offering one-half the annual delay rental (a few hundred dollars), Steckman Ridge presented the Smiths with a $356,202.65 check to extend the lease.  This check was for payment of both the delay rental and the recoverable gas reserves in the well.  Under these circumstances, Steckman Ridge made a good faith effort to extend the lease within the time allowed by the shut-in clause.  To find otherwise—namely, that the lease was forfeited due to Steckman Ridge's failure to offer

---

[8] For supporting cases, see *T.W. Phillips Gas & Oil Co. v. Jedlicka*, 964 A.2d 13, 16 (Pa. Super. Ct. 2008), *aff'd*, 42 A.3d 261 (Pa. 2012) (finding that good faith is considered when determining whether an oil and gas lease is forfeited); *see also McCausland v. Wagner*, 78 A.3d 1093, 1102 (Pa. Super. Ct. 2013) ("We observe it is an oft-stated maxim that the law abhors a forfeiture.") (citation omitted).

payment of a nominal shut-in royalty—would be highly inequitable and at odds with the clear intentions of the parties.[9]

In making its decision, the Court emphasizes that Steckman Ridge has acted at all times in good faith to extend the lease. Since 2007, Steckman Ridge has continually offered the Smiths timely delay rentals, even as recently as June 24, 2013. (ECF No. 84-2 ¶ 29). Given that Steckman Ridge has made continuous efforts in good faith to make the required payments under the lease, the Court finds that the offer of payment for gas storage was sufficient to extend the lease and to hold the lease in force.

### G.    Estoppel

Estoppel provides a separate justification to find that the lease remains in force. Pennsylvania courts have routinely used estoppel to uphold otherwise unenforceable agreements. "[A] person may be estopped by his conduct, his statements, or even his silence, if another has thereby been induced to act to his detriment." *Fried v. Fisher*, 196 A. 39, 41 (Pa. 1938). Although Pennsylvania courts have applied principles of estoppel in a variety of contexts, for purposes of this decision, the rule can be aptly stated as follows: a person who accepts the benefits of a transaction should remain bound by its obligations.

---

[9] *McCausland v. Wagner*, 78 A.3d 1093, 1105 (Pa. Super. Ct. 2013) substantiates this finding. The Pennsylvania Superior Court found that it would "impede[] logic" for the oil and gas industry to develop a lease "that allows a lessor to declare a forfeiture for failure to make a royalty payment after a well has been completed and oil or gas is being produced." *Id.* Here, similar reasoning supports the finding that a lease should not be forfeited for failure to offer a payment of a nominal shut-in royalty, provided that a substantial payment was offered for the economically recoverable gas reserves (which included a delay rental) within the time permitted by the shut-in clause.

31 C.J.S. *Estoppel and Waiver* § 163 (2013); *Laurel Mobile Health Servs. Ltd. v. Com., Dep't of Health,* 550 A.2d 616, 621 (Pa. Commw. Ct. 1988).

The Smiths assert that the lease terminated in 2007, and yet, two years later, they accepted $387,000.78 from Steckman Ridge for gas storage. This sum was indisputably intended as payment for the delay rental and for the estimated recoverable gas reserves in Well 1663, as required under the conversion-to-storage provision. The Smiths provide no explanation for accepting this payment, other than by arguing that they are nevertheless entitled to it. (ECF No. 85 at 8). It is difficult to imagine circumstances better suited to estoppel: the Smiths accepted substantial payments under the lease, and equity now demands that they remain bound by their agreement. Thus, even if the lease was forfeited in 2007, it is now enforceable against the Smiths because they are estopped from contesting the lease's validity. To be clear, estoppel provides an entirely separate basis for holding that the lease is valid and enforceable.

### H. The lease is not against public policy

The final issue before the Court is whether the lease amounted to a "no term" lease and is thus unenforceable under Pennsylvania law. In support, the Smiths reference *Hite v. Falcon Partners*, 13 A.3d 942, 946 (Pa. Super. Ct. 2011). According to the Smiths, *Hite* shows that delay rentals cannot be paid to extend a lease indefinitely, as allegedly happened here. (ECF No. 92 at 26:18-25). Interestingly, the Smiths do not discuss any specific terms in the lease they now deem unenforceable, nor do they mention any of the pertinent facts the Pennsylvania Superior Court had considered in *Hite*.

The lease in *Hite* included a one-year primary term that could be extended indefinitely by production activities or through payment of delay rentals. In other words, the company had no obligation to develop the leasehold during the primary term as long as the company paid nominal delay rentals. *Hite*, 13 A.3d at 948. Several years had passed, and yet the company took no action to commence drilling on the property. The Superior Court found that, as a matter of public policy, the lease was unenforceable:

> [t]o find as [the company] urges, that it may pay delay rental indefinitely, thereby denying Plaintiffs the opportunity to reap the financial benefits of actual production, would be contrary to the decisions of our Courts, at odds with the presumed intention of the parties in executing the leases in the first place, and in stark contrast to the clear opinion of the courts of Pennsylvania that the obligation to pay delay rentals is intended to spur the lessee toward development.

*Id.* (internal quotations omitted) (citations omitted).

After carefully reviewing the decision in *Hite*, the Court is confident that the law in Pennsylvania provides that an oil and gas lease is unenforceable if it seeks to extend the lease beyond the primary term through delay rentals only, even though no production has ever occurred under the lease. That is not the issue here.

While perhaps useful as background on public policy, the decision in *Hite* offers little immediate guidance to the Court. Indeed, the dissimilarities between this case and *Hite* are striking. *Hite* did not involve a dual purpose lease, nor did it involve a shut-in well capable of producing gas in paying quantities. *Hite* involved a company that failed to develop the leasehold, even though years had passed since the execution of the lease. Steckman Ridge has undeniably developed the leasehold. Indeed, due to Steckman

Ridge's production activities, the Smiths earned $872,031.52 in royalties. The Smiths also earned $387,000.78 for recoverable gas reserves on the property.

As a final point, the decision in *Hite* shows that Pennsylvania public policy favors oil and gas leases that "promote the full and diligent development of the leasehold for the mutual benefit of both parties." *Hite*, 13 A.3d at 945. Here, the lease at issue achieves that goal and is not against Pennsylvania public policy.

I.      **Moving forward**

The Court has determined that the lease is valid and that Steckman Ridge has the continued right to store gas under the Smiths' property. To maintain gas storage activities, Steckman Ridge must pay the outstanding delay rentals. As discussed above, Steckman Ridge has attempted to pay delay rentals, but the Smiths have refused these payments. Consistent with this opinion, Steckman Ridge must pay a shut-in royalty in an amount equal to one-half the annual delay rental for the six-month period between December 2006 and June 2006. Furthermore, Steckman Ridge must pay the annual delay rentals that have accrued since the property was converted to storage in 2007. Finally, Steckman Ridge must continue to pay the delay rentals as they become due under the lease.

VI.      **Conclusion**

The Court has carefully considered all of the parties' arguments. To the extent any issue was not specifically addressed above, it is either moot or without merit. For

the reasons stated in this memorandum opinion, summary judgment will be entered in favor of Steckman Ridge.

In brief, summary judgment is warranted because there are no disputes of material fact. The lease is not ambiguous and therefore the interpretation of the lease is entirely a question of law.[10] In applying the general principles of contract interpretation, the Court found that the shut-in clause permitted an extension of the lease. The July 3, 2007 offer of payment for gas storage—which included compensation for the estimated recoverable gas reserves and the annual delay rental—was sufficient to keep the lease in full force. Additionally, the lease is otherwise enforceable because the Smiths are now estopped from contesting its validity. Because the lease remains in full force, and its relevant terms are not against public policy, the Smiths' claims fail as a matter of law.

To continue gas storage activities under the Smiths' property, Steckman Ridge must compensate the Smiths for the outstanding delay rentals, and it must continue to make all other required payments as they become due under the lease.

An appropriate order follows.

---

[10] The Court recognizes that, in its previous decision denying partial summary judgment, the Court stated that certain terms were not "clearly and unambiguously set out" in the lease. (ECF No. 35 at 10). The Court ruled on the first motion for summary judgment three and a half years ago, and before any fact discovery took place. Upon further consideration of the lease, and after a thorough review of both reliable secondary sources and recent Pennsylvania case law, the Court no longer believes there is any ambiguity in the lease. Moreover, even after four years of litigation, the Smiths have come forward with no factual or legal support for their position that the lease is ambiguous. As set forth in this memorandum opinion, summary judgment must be entered in favor of Steckman Ridge.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

WILLIAM W. SMITH and ANGELA M.   )
SMITH,   )
                                )     **CIVIL CASE NO. 3:09-268**
           **Plaintiffs,**   )
                                )     **JUDGE KIM R. GIBSON**
         **v.**   )
  )
**STECKMAN RIDGE, LP,**   )
  )
          **Defendant.**   )

## ORDER

NOW, this **27th** day of March 2014, for the reasons stated in the accompanying memorandum opinion, it is **HEREBY ORDERED** that Defendant's motion for summary judgment (ECF No. 81) is **GRANTED**.

It is **FURTHER ORDERED** that, no later than sixty (60) calendar days after the entry of this Order, Defendant shall compensate Plaintiffs for the outstanding delay rentals due under the lease.

It is **FINALLY ORDERED** that the pending motions in limine (ECF Nos. 97, 99, 101, 103, 105, and 107) are **DENIED** as moot.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**